UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| L.B.,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC, UBER COLOMBIA, S.AS., and RASIER, LLC, and RASIER-CA, LLC,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED AND ENDORSED HEREON** |

Plaintiff, Plaintiff L.B., complaining against the defendants UBER TECHNOLOGIES, INC, UBER COLOMBIA, S.AS., RASIER, LLC, and RASIER-CA, LLC, hereby alleges as follows:

**INTRODUCTION**

1. In 2009, when Uber was founded, the general public considered it unreasonably dangerous for a young woman (or any solo traveler for that matter) to get into a complete stranger's private car in order to travel to a specific destination. That would have been considered hitchhiking. A foreseeable risk of hitchhiking was the potential for sexual assault. Over the decades following his rise to fame, Mr. Combs' star-studded, larger-than life persona overshadowed his vicious temper and pervasive acts of violence directed towards those in his inner circle – specifically, women.

2. Uber first launched in San Francisco in 2010 as UberCab. At first, it used its mobile phone application to dispatch black Lincoln Town Cars and limousines, operated by licensed professional drivers who worked with regulated, licensed Charter-Party Carrier (TCP) businesses. It branded itself "Everybody's Private Driver."

3. In 2012, Uber expanded its offerings to include traditional taxi services, and also less expensive rides in unmarked "hybrid and mid-range cars in a variety of colors," still operated by licensed, regulated TCPs. It called these cheaper rides "UberX."

4. In order to maximize profits, Uber, which by then had expanded into markets around the world, adopted "ridesharing" concept originated by competitor Lyft, wherein random laypersons, instead of professional drivers, could operate as Uber drivers using their own vehicles.

5. In 2013, Uber decided to start offering this novel form of application-supported transportation, where Uber would connect individuals who need a ride with individuals who have a driver's license, access to a car, and willingness to offer a ride (so-called "peer-to-peer rides" or "ridesharing"). For the first time, Uber was connecting riders with drivers who were not associated with licensed taxis or TCPs; however, this fact was not disclosed to Uber users and not discernable to the rider who was driving the vehicle—a trained professional or a random person.

6. Uber's new transportation system was convenient and affordable for the public, and lucrative for Uber. On the other hand, Uber's business model placed a rider who was trusting in Uber's reputation, and a driver about whom the rider and Uber both knew very little, in an isolated setting (a private vehicle) with limited means for the rider to escape if something went awry. This business model foreseeably increased risk of sexual assault, especially for solo women passengers.

7. Uber should have taken action to prevent such assaults, but chose instead to pursue rapid growth at all costs.

8. Uber worked to promote the alleged safety of its service in order to increase market share and profits. Uber did so by assuring passengers that Uber was safe: the "safest rides on the road," "a ride you can trust," and a service that "was created to ensure reliable access to safe rides[.]" Even today, Uber continues to maintain that "safety is a top priority[.]" This ubiquitous messaging generated reassurance that passengers could count on Uber to keep them safe. It removed the friction that would otherwise prevent people from using Uber's product.

9. Uber also misleads riders by displaying each driver's purported overall rating (out of five stars) next to the driver's total number of trips. But the star rating actually reflects only the past 500 trips, not a complete track record. Moreover, Uber drops some low reviews from the overall star rating it displays. It does not tell riders that this information is incomplete and inflated.

10. Uber expanded nationwide, and then globally, including the country of Colombia;

however, a rider uses the same Uber account, and logs into the same Uber app, no matter where she is in the world, to book her Uber ride. Uber benefited and profited from its brand recognition: American travelers abroad can book a familiar service to ensure alleged safe travel.

11. As early as 2014, Uber became aware that Uber drivers were sexually assaulting passengers. In the eleven years since, sexual predators driving for Uber have continued to sexually assault, harass, kidnap, physically assault, and/or restrain Uber passengers, including Plaintiff. Complaints to Uber by passengers who had been attacked by Uber drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Uber has been fully aware of these continuing attacks by sexual predators driving for Uber. Uber's response to these ongoing sexual assaults by Uber drivers has been slow and inadequate.

12. While Uber has, in recent years, publicly acknowledged this sexual assault crisis, including the publication of Uber's U.S. Safety Report, in December 2019, Uber has failed to implement basic safety measures necessary to prevent these serious sexual assaults, which continue to occur to this day.

13. As more women courageously speak out, Plaintiff has been empowered by this collective strength and now adds her voice to the growing chorus of victims bravely sharing their harrowing stories of abuse and intimidation.

14. Plaintiff was kidnapped, forcibly retrained, sexually assaulted, harassed, battered, and/or otherwise attacked by an Uber driver in connection with an Uber ride in Cartagena, Colombia on January 23, 2025. Plaintiff had been led to believe that the Uber driver she hires would give her a safe ride to her destination.

15. The Uber ride at issue was ordered by Plaintiff through the ride-sharing software application owned and controlled by Uber (the "Uber App"). At all relevant times, Defendants operated and controlled by the Uber App.

16. The Uber driver, while in the course and scope of his employment for Uber and while otherwise working on behalf of Uber, kidnapped, forcibly restrained, sexually assaulted, battered, falsely imprisoned, stalked, harassed, and/or otherwise attacked Plaintiff, as set forth below.

## JURISDICTION AND VENUE

17. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) as Plaintiff is a citizen of the State of New York and Defendants are citizens of Delaware, California, and Colombia.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the plaintiff is a resident of the State of New York, County of Kings.

19. The amount in controversy in this case exceeds $150,000.00.

## PARTIES

20. At all times material to this cause of action, Plaintiff L.B. was and still is a resident of the State of New York, County of Kings.

21. L.B. brings this Complaint under her initials rather than her full name because of the sensitive nature of the allegations being sexual abuse. Plaintiff fears embarrassment and further psychological damage if her identity as a victim of sexual abuse became public knowledge.

22. Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business at 1515 3rd Street, San Francisco, California, 94158.

23. Defendant UBER COLOMBIA, S.AS., is a Colombia corporation with its principal place of business at CL 93 17 45 OF 702 Cundinamarca, Colombia.

24. Defendant Rasier, LLC is a Delaware limited liability company. On information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its

principal place of business at 1515 3rd St., San Francisco, California, 94158. On information and belief, Rasier, LLC is entirely controlled by Uber Technologies, Inc.

25. Defendant Rasier-CA, LLC is a Delaware limited liability company. On information and belief, Rasier-CA is a wholly owned subsidiary of Uber Technologies, Inc. Rasier-CA maintains its principal place of business at 1515 3rd St., San Francisco, California, 94158. Rasier-CA is the one of the primary Uber entities that has interfaced with the California Public Utilities Commission, and so its activities affect Uber passengers in all states. On information and belief, Rasier-CA is entirely controlled by Uber Technologies, Inc.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

26. This is an action for injuries and damages suffered by Plaintiff, as a direct and proximate result of the Defendants' wrongful conduct, which took place on January 23, 2025.

27. Prior to the conduct at issue, Plaintiff downloaded the Uber application onto her phone, created an account, and used the app to book rides.

28. Prior to the conduct at issue, the Plaintiff, traveled to Cartagena, Colombia from her home in New York City.

29. On January 23, 2025, Plaintiff opened the Uber application on her phone to book transportation from Café Havana in Cartegena to Hotel Estelar, also in Cartagena.

30. Plaintiff used the same Uber application in Colombia that she did while home in the United States.

31. The distance between the two locations is 2.8 kilometers, or approximately a ten minute drive.

32. An Uber ride was booked at 1:26 AM with an Uber driver named Jesus (last name presently unknown), who drove a Chevrolet Joy bearing license plate number LRM234. According

to the Uber app he had been driving with Uber for one year.

33. Uber driver Jesus picked plaintiff up the plaintiff at 1:30 AM from Café Havana. The Uber driver confirmed Plaintiff's name and her destination before commencing the ride.

34. Hotel Estelar is large, well-known, well-lit, and visible and obvious on approach in a vehicle.

35. Uber driver Jesus asked the plaintiff personal and inappropriate, including whether plaintiff had a boyfriend or husband.

36. Jesus then drove the plaintiff past the Hotel Estelar, despite protests from the plaintiff.

37. Uber driver Jesus drove the plaintiff to an isolated area several kilometers away from her destination, against plaintiff's will and despite plaintiff's protests.

38. Uber driver Jesus stopped the car at the remote location, and began to restrain plaintiff by grabbing her arms and shoulders, without plaintiff's consent and despite her protests.

39. Uber driver Jesus forcibly turned plaintiff's body toward his and kissed the plaintiff, without plaintiff's consent and despite her protests.

40. Plaintiff struggled with the Uber driver and tried unsuccessfully to push the Uber driver away.

41. Uber driver Jesus then grabbed the plaintiff with more force, restraining her again, without plaintiff's consent and despite her protests.

42. Then, the Uber driver forced another kiss upon the plaintiff, and forced his tongue into her mouth, without plaintiff's consent and despite her protests.

43. Plaintiff was able to fight off the Uber driver, bruising her arm in the process, and she demanded he return her to the hotel repeatedly.

44. Only then did the Uber driver comply, bringing Plaintiff to the hotel at 2:08 AM.

45. For over thirty minutes, plaintiff felt terrorized and threatened by the Uber driver, and she feared for her life and safety. Plaintiff was extremely upset and in shock.

46. As soon as Plaintiff arrived back at Hotel Estelar, at 2:09 AM on January 23rd, she immediately reported the incident to Uber, complaining of kidnapping and violent sexual assault. However, the Uber driver issued a false and retaliatory complaint against her, falsely accusing her of being under the influence of alcohol or illicit substances.

47. Uber, instead of believing the victim, threatened the plaintiff with deactivation of her account. Uber populated an automatic response of "no response needed," leaving the plaintiff unable to provide a rebuttal in that chat.

48. Plaintiff initiated multiple communications with Uber to further explain the situation further, she did not receive responses for over two weeks.

49. Plaintiff suffered a severe traumatic reaction following the incident, and required assistance from airline workers to board her flight from Columbia back home to the United States.

50. Plaintiff only received a response from Uber after she contacted Troy Stevenson, Global Head of Customer Operations on February 7, 2025 directly (outside of the Uber application).

51. While Uber now claims to take the plaintiff's allegations seriously, there has been no confirmation whether the driver Jesus is still working with Uber, nor any proof of an investigation nor any plan for corrective action.

52. As a result of the foregoing, plaintiff has been damaged physically and emotionally, through no wrongful conduct on her part.

**<u>FIRST CAUSE OF ACTION</u>**

**PUNITIVE DAMAGES**

53. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

54. As alleged above, Uber knew it faced an ongoing problem of its drivers assaulting or harassing its passengers. As early as 2014, Uber knew that its drivers were sexually assaulting or harassing women or other vulnerable passengers. Since 2014, Uber has received frequent passenger complaints about driver sexual misconduct, including sexual assault and restrain, it has been repeatedly notified of police investigations of the criminal sexual conduct of drivers acting within their capacity as Uber drivers, and it has been the subject of numerous civil suits and arbitrations alleging the sexual harassment and sexual assault of Uber's passengers by Uber's drivers. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

55. Nevertheless, even though Uber was fully aware of its sexual misconduct problem it failed to take safety precautions to protect its passengers.

56. Even after Uber was aware of widespread sexual misconduct on the part of its drivers, Uber and its executing officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them.

57. The decision not to implement more thorough and persistent background checks was driven by Uber executives' desire for rapid expansion and increased profits, because the more drivers driving for Uber, the more money there was to be made.

58. Prioritizing profits over safety, Uber and its executive officers also made the conscious decision not to warn its customers or users of the risk of being assaulted, even after Uber and its leadership were fully aware of this risk.

59. Safety precautions such as enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; ongoing monitoring of Uber drivers and rides

through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers or by deviating substantially from the assigned route; a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride; a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers; creating and instituting a system encouraging customer reporting; adequate monitoring of customer complaints by well-trained and effective customer-service representatives; warnings to passengers of the dangers of being attacked by Uber drivers; and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage. Because of this, Uber, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its passengers at greater risk of kidnapping, sexual assault, harassment, and exploitation by Uber's own drivers.

60. Prioritizing profits over passenger safety, Uber and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its passengers, including that of Plaintiffs and the public.

61. Uber also misrepresented the safety of its rides to Plaintiffs and the public, intentionally and actually inducing reliance on those statements and omissions.

62. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

## SECOND CAUSE OF ACTION

## NEGLIGENCE

63. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

64. Uber has been on notice that its drivers have been sexually harassing, sexually assaulting, and kidnapping since at least 2014. Uber was aware or should have been aware that some Uber drivers would continue to sexually assault, stalk, harass, kidnap, physically assault, and/or otherwise attack their vulnerable Uber patrons and passengers.

65. Uber owed a duty because it distributed and promoted its platform while on notice of acts of widespread sexual assault and harassment committed by its drivers against its passengers.

66. Uber owed a duty because its prior conduct created a risk of harm to Plaintiffs, and caused them actual harm.

67. Uber owed a duty because the risk of harm to Plaintiffs was embedded in, and an inherent component of, its negligent business practices.

68. Uber owed a duty because it controlled the drivers.

69. Uber owed a duty because it designed and controlled the transportation experience and environment for both drivers and passengers.

70. Uber owed a duty because it voluntarily undertook to provide a "safe ride" to passengers, its failure to exercise case increased the risk of harm to passengers, and the harm was suffered because of passengers' reliance on Uber's undertaking.

71. Uber owed a duty because it offered and contracted to provide rides to the public, and this offer carried an implied warranty that it would provide rides safely.

72. Uber owed a duty because it retained control over its drivers and exercised that retained control in a manner that affirmatively contributed to Plaintiffs' injuries by making sexual assaults in Uber vehicles dramatically more likely.

73. Since learning of the sexual assaults perpetrated by its drivers, Uber never adapted or improved its safety procedures in any meaningful way.

74. Uber does not require video monitoring of its drivers that cannot be turned off, nor does it provide emergency notification to Uber and the authorities when a driver drastically veers off course from the passenger's destination, abruptly cancels the ride, or ends the ride at the intended destination but GPS data indicates the passenger remains in the car for a significant period of time.

75. At all times relevant, Uber was well aware of the dangers its drivers posed, yet it still induced, and continues to induce, the public, including Plaintiff, to rely on Uber as a safe means of transportation. In doing so, Uber failed to warn passengers, including Plaintiff, of the possibility of being kidnapped, sexually assaulted, sexually battered, restrained, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver.

76. At the time Plaintiff was assaulted, Uber did not require sexual harassment/assault training for its drivers, nor did it have any policies in place for immediate termination if a driver engages in sexual misconduct.

77. Uber does not cooperate with the police when a driver commits an illegal sexual attack on its passengers. Despite having the express right to disclose driver information at Uber's sole discretion, Uber requires that extensive standards be met before the company will even consider law enforcement requests for information. Even after a report of sexual assault has been made, Uber generally requires a subpoena before it will release information.

78. When hiring new drivers, Uber does not verify driver identities with biometric background checks. Uber does not correct for false negatives created by its name-based screening procedures. Uber does not provide industry-standard background checks which would provide the most comprehensive means of screening applicant drivers. Uber does not invest in continuous monitoring of its drivers and is not immediately alerted when one of its drivers is implicated in criminal acts.

79. Uber does not have a consistent, reliable system for addressing passenger reports of sexual assault by its drivers and continues to let dangerous predators drive for and earn money for Uber.

80. For the above reasons and others, Uber breached its duty of reasonable care to Plaintiff.

81. As a legal and direct result of Uber's aforementioned conduct and omissions, Plaintiff was kidnapped, sexually assaulted, sexually battered, restrained, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The assaults on Plaintiff caused them to suffer psychological and physical harm from which she may never fully recover.

82. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

## THIRD CAUSE OF ACTION

## NEGLIGENT HIRING, SUPERVISION, AND RETENTION

83. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

84. Uber engaged and retained or otherwise employed Uber driver who sexually assaulted, stalked, harassed, kidnapped, physically assaulted, restrained, and/or otherwise attacked Plaintiff as described above.

85. Uber did not interview, check the references of, provide training to, or advise the Uber driver of any anti-sexual assault policies when hiring them. Uber had no reasonable basis for believing Uber drivers in general were fit to drive vulnerable women around, particularly at night, and failed to use reasonable care in determining whether Uber drivers' were fit for the task.

86. Uber should have known of the unfitness of the Uber driver involved in the assaults described herein but failed to use reasonable care to discover their unfitness and incompetence.

87. Despite failing to reasonably endeavor to investigate the incompetence of Uber drivers, including the ones who harmed Plaintiff, for transporting vulnerable and or intoxicated women late at night in a moving vehicle, Uber hired said driver to do exactly that.

88. Uber knew or should have known that assigning the task of transporting vulnerable passengers late at night to an inadequately screened drivers created an unreasonable risk of harm to Uber's passengers, including Plaintiff, particularly when Uber had been on notice of the string of sexual assaults committed by Uber's drivers.

89. Uber failed to employ measures to adequately supervise its drivers.

90. Uber failed to adequately record, investigate, and respond to passenger reports of unsafe conduct such as sexual harassment and sexual assault by Uber drivers.

91. Uber was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to passengers, including but not limited to Plaintiff and other vulnerable passengers traveling alone.

92. The Uber driver who assaulted Plaintiff was, and/or became, unfit to perform the work for which they were hired as they improperly and illegally took advantage of Plaintiff when

they attempted to use the service for a safe ride to her destination, thereby causing psychological and or physical harm.

93. Because of the Uber driver's unfitness to perform the task of transporting Plaintiff, Plaintiff was sexually assaulted, harassed, sexually battered, restrained, falsely imprisoned, and/or otherwise attacked which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

94. Uber's negligence in hiring, retaining, and or supervising Uber drivers, including the driver who harmed Plaintiff, caused Plaintiff to be kidnapped, sexually assaulted, sexually battered, restrained, falsely imprisoned, stalked, harassed, and/or otherwise attacked by her Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attacks on Plaintiff caused Plaintiff to suffer both physical and or psychological harm from which some may never fully recover.

95. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

## FOURTH CAUSE OF ACTION

## COMMON CARRIER NEGLIGENCE

96. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

97. At the time Plaintiff was falsely imprisoned and sexually assaulted, Uber was a common carrier as it provided transportation to the general public. Uber provides transportation through a digital application made available to the general public for the purpose of transporting its users, the passengers, from place to place for profit. Uber has widely offered its services to the

general public and charges standard fees for its services through its application. Uber does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Uber's services for transportation.

98. As a common carrier, Uber must carry its passengers, including Plaintiff, safely.

99. Uber has a duty to employ the utmost degree of care and diligence that would be expected of a very cautious company. Uber has a duty to do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers, including Plaintiff.

100. Uber must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business.

101. Despite complaints to Uber of sexual assaults committed by Uber drivers and lawsuits against Uber for sexual assault, Uber has failed to implement safety precautions that would adequately address its sexual assault problem.

102. Uber does not provide a consistent and reliable way for passengers to report sexual abuse and assault.

103. Uber does not warn passengers of the dangers of riding with Uber and fails to warn passengers of past complaints regarding Uber drivers.

104. Uber does not have an effective program in place to deal with the sexual predator crisis posed by some of its drivers.

105. Uber knows its passengers are in a uniquely vulnerable situation enclosed in a moving vehicle and that a subset of its driver are sexual predators.

106. Uber has not exercised reasonable care to protect its passengers from harassment, assault, and sexual assault by Uber's drivers.

107. Uber has not exercised the utmost degree of care in order to protect its passengers from the danger posed by sexual predators who drive for Uber. If Uber had used the highest degree of care, Uber could have prevented or dramatically reduced the likelihood of the sexual assault of its passengers, including Plaintiff.

108. Uber failed to safely transport Plaintiff.

109. Uber failed to use the utmost care and vigilance to protect Plaintiff from its own driver who sexually assaulted, stalked, harassed, kidnapped, physically assaulted, restrained, and/or otherwise attacked Plaintiff while Uber was transporting them.

110. Uber failed to take reasonable precautions to protect its vulnerable passengers, including Plaintiff, from the foreseeable and known risk of sexual assault, harassment and/or restrain by its drivers. If Uber had used the highest degree of care, Uber could have prevented or reduced the likelihood of the sexual assault of its passengers, including Plaintiff.

111. As a legal and direct result of the aforementioned conduct and omissions of Uber, Plaintiff was kidnapped, sexually assaulted, sexually battered, restrained, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both physical and/or psychological harm from which she may never fully recover.

112. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

**FIFTH CAUSE OF ACTION**

**NEGLIGENT FAILURE TO WARN**

113. Plaintiff hereby incorporates by reference the preceding causes of action and factual allegations.

114. Uber's conduct created a risk of physical or emotional harm to its passengers, including Plaintiff.

115. In operating its business, Uber knew and had reason to know that its passengers were at risk of sexual assault and abuse by Uber's drivers since at least 2014. Since then, Uber has received frequent passenger complaints about driver misbehavior, has been notified of police investigations of drivers' criminal conduct while acting within their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual harassment and sexual assault of Uber's passengers by Uber's drivers.

116. Despite the knowledge of the danger its enterprise created, Uber prioritized profits over passenger safety and did not alert its passengers, including Plaintiff, to the risk of sexual assault by Uber driver.

117. In fact, Uber continued to market itself as a service that provides "safe" rides, even to unaccompanied and/or intoxicated passengers, knowing sufficient measures had not been employed to keep passengers safe from being sexually assaulted.

118. Uber itself represented to its passengers that riding with Uber is safe, implying it is free of risk from sexual assault.

119. Uber did not warn that its criminal background checks of Uber drivers were limited, nor did it warn that it sometimes allows drivers to continue driving for Uber even after a passenger report to Uber she was sexually assaulted.

120. Uber had reason to know that passengers would be unaware of the risk of sexual assault by Uber drivers.

121. A warning to its passengers that they were at risk of sexual assault by Uber drivers would have reduced the risk of harm to passengers, including Plaintiff, who could have arranged for alternative transportation or taken additional safety precautions and avoided the assaults they suffered at the hands of Uber drivers.

122. Plaintiff would not have ridden alone in an Uber had Uber provided an adequate warning regarding the risk of being kidnapped, sexually assaulted, sexually battered, restrained, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver.

123. As a legal and direct result of Uber's aforementioned conduct and omissions, Plaintiff was kidnapped, sexually assaulted, sexually battered, restrained, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attacks on Plaintiff caused Plaintiff to suffer both physical and or psychological harm from which she may never fully recover.

124. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

## SIXTH CAUSE OF ACTION
## VICARIOUS LIABILITY

125. Plaintiff hereby incorporates by reference the preceding causes of action and factual allegations.

126. Uber is vicariously liable for the torts of its drivers through the theories of *respondeat superior*, nondelegable duties, agency, and ostensible agency. Uber's liability for the acts of its drivers are not contingent upon the classification of its drivers as employees.

127. Under the doctrine of *respondeat superior*, Uber is responsible for the torts of its employees committed within the scope of employment. The modern rationale for the theory is that an employer who profits from an enterprise which, through the torts of his employees, causes harm to others should bear the costs of the injury instead of the innocent injured Plaintiff.

128. Uber profits from transporting vulnerable passengers late at night. Uber encourages intoxicated passengers to use its services. At the same time, Uber does not take reasonable steps to protect its passengers or warn them of the dangers of riding with Uber. Uber should bear the costs of injuries that result from torts such as sexual assault, kidnapping, and restrain, not the victims of Uber's negligence, willful wrongdoing and intentional omissions made at the expense of passenger safety.

129. Uber drivers are employees and agents of Uber. Uber reserves the right to control the activities of Uber drivers. Uber controls the prices charged to customers, controls contact with the customer base, controls the ability of a driver to see where he will be driving before he accepts a ride, and reserves the right to terminate drivers with or without cause.

130. The kidnapping, sexually assault, sexually battery, restrain, falsely imprisonment, stalking, harassment, and/or other attack Plaintiff suffered was perpetrated by Uber driver within the scope of their employment and authority. The kidnapping, sexual assault and/or restrain of intoxicated and unaccompanied women who have been placed in an improperly screened Uber drivers' car with little to no supervision is incidental to and a foreseeable result of the act of transporting passengers.

131. Uber may maintain that its drivers are contractors and not employees. Nevertheless, whether Uber drivers are characterized as contractors, employees or agents, Uber has a non-delegable duty to transport its passengers safely.

132. The doctrine of nondelegable duty recognizes that for public policy reasons, certain duties cannot be delegated to a third party. It operates to ensure that when a harm occurs the injured party will be compensated by the party whose activity caused the harm and who may therefore properly be held liable for the acts of his agent, whether the agent was an employee or an independent contractor. The doctrine recognizes that an entity may not delegate its duties to a contractor in order to evade its own responsibilities. This is especially so when allowing delegation would incentivize the employers to hire incompetent contractors in order to further the employer's pecuniary interests.

133. In advertising to passengers, including Plaintiff, that Uber provides them a safe ride to their destinations, and by profiting off women who use Uber for that very purpose but then are attacked, Uber has a duty to its passengers that cannot be delegated. To allow Uber to delegate the liability for the assaults committed by its drivers to anyone else would encourage Uber to continue to utilize the cheapest, fastest, and most haphazard safety procedures. Uber would be disincentivized from hiring only competent drivers, since the more drivers Uber has, the more money Uber makes.

134. Further, Uber drivers function as agents of and operate as extensions of Uber. Uber drivers represent Uber's business and further Uber's pecuniary interests.

135. Uber drivers display the Uber logo when interacting with passengers, and in many cases Uber drivers are the only people with whom Uber's passengers have direct contact. Uber drivers provide the service that Uber claims to provide-- transportation.

136. By allowing Uber drivers to represent Uber's business, Uber creates the impression that its drivers, including Uber driver, were Uber's employees and/or agents.

137. Plaintiff reasonably believed that her Uber driver was an employee or agent of Uber, and, relying on this belief, got in a vehicle with him in exchange for a fee and suffered harm as a result of her contact with the driver.

138. For these reasons and others, Uber is vicariously liable for the tortious acts of Uber driver, regardless of whether Uber's driver is an employee, agent, apparent agent, or contractor of Uber.

139. As a direct and legal result of the Uber driver's tortious conduct, Plaintiff was kidnapped, sexually assaulted, sexually battered, restrained, falsely imprisoned, stalked, harassed, and/or otherwise attacked which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attacks on Plaintiff caused Plaintiff to suffer both physical and or psychological harm from which she may never fully recover.

140. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

## <u>SEVENTH CAUSE OF ACTION</u>
## VICARIOUS LIABILITY FOR SEXUAL ASSAULT

141. Plaintiff hereby incorporates by reference the preceding causes of action and factual allegations.

142. At the time Plaintiff was sexually assaulted, the Uber driver involved intended to cause harmful and offensive contact with Plaintiff and Plaintiff was in reasonable apprehension of imminent, harmful, and offensive contact. The Uber driver involved in each assault intentionally

and recklessly did acts which placed Plaintiff in apprehension of imminent harm, including being sexually assaulted and battered.

143. These Uber drivers committed these tortious and wrongful acts while acting in the course and scope of their employment with Uber as an employee/agent of Uber. Therefore, Uber is liable for the Uber drivers' sexual assaults of Plaintiff and is responsible for damages caused by said conduct under the principles of vicarious liability, including the doctrine of *respondeat superior*. Even if the Uber drivers had not been employees, Uber's duty to provide transportation free of assault is nondelegable, and Uber is liable for its drivers' actions, because to allow Uber to delegate its duty of providing the safe transportation it promises would incentivize Uber to create a greater risk of harm to the public.

144. For these reasons and others, Uber is vicariously liable for the sexual assaults Plaintiff suffered at the hands of her respective Uber driver.

145. As a direct and legal result of the Uber driver's sexual assault, Plaintiff was humiliated, degraded, violated, and robbed of her dignity and personal safety. The depraved attacks on Plaintiff caused Plaintiff to suffer both physical and psychological harm from which she may never fully recover.

146. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

## ELEVENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

147. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

148. For several years prior to Plaintiff being sexually assaulted by an Uber driver, Uber was fully aware that other passengers had been sexually assaulted and restrained by Uber drivers. Since at least 2014, Uber has received frequent passenger complaints about drivers misbehavior, has been notified of police investigations of the criminal conduct of drivers acting within their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual harassment and sexual assault of Uber's passengers by Uber's drivers.

149. Uber made a conscious decision not to implement procedures that would effectively screen its drivers and monitor its drivers to identify and terminate drivers who were sexual predators.

150. Safety precautions such as enhanced background checks, biometric fingerprinting, job interviews, electronic monitoring systems, warnings to passengers of the dangers of being attacked by Uber drivers, and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage. Because of this, Uber decided not to implement such precautions and instead continues to place its passengers at greater risk of sexual assault and restrain by Uber's own drivers.

151. Additional safety precautions that Uber chose not to make include but are not limited to: ongoing monitoring of Uber drivers through available technology including cameras and GPS; a zero tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers, or by deviating substantially from the assigned route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; creating and instituting a system encouraging customer reporting; and adequate monitoring of customer complaints by well-trained and effective customer service representatives. Uber chose not to

implement such precautions, nor did it warn passengers of the risk of being sexually assaulted in light of the fact that these safety precautions had not been implemented.

152. In failing to take these and other safety precautions designed to protect passengers from sexual predators driving for Uber, Uber breached its duty of reasonable care, negligently inflicting emotional harm upon Plaintiff, and acted recklessly and in conscious disregard of her safety.

153. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

## TWELFTH CAUSE OF ACTION
## BREACH OF CONTRACT

154. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

155. Plaintiff entered into a contract with Uber. The essence of this commercial transaction was the payment of a fee to Uber in exchange for safe and reasonable transportation to her destination.

156. As a result of the conduct, acts and omissions set forth above, Uber breached its contract with Plaintiff, including breaching implied covenants which would be inherent in such a contract.

157. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff

seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

## THIRTEENTH CAUSE OF ACTION
## STRICT PRODUCT LIABILITY: DESIGN DEFECT

158. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

159. Uber manufactured and distributed the Uber App.

160. The Uber App did not perform as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way, because the Uber App falsely led Plaintiff to form a reasonable minimum safety expectation that was not met.

161. The Uber App did not include safety features such as a GPS tracking system that would alert Uber, to the early termination of a ride, substantial deviation from the intended route, or a passenger continuing to travel in the Uber vehicle after the drivers ended the ride in the app. It also did not include the automatic activation of the camera in drivers' smart phones when a ride is in progress.

162. The Uber App also failed to communicate with Plaintiff a true expectation of the lack of safety in using Uber.

163. These flaws in the design of the Uber App, were a substantial factor in causing harm to the Plaintiff, which included being kidnapped, sexually assaulted, sexually battered, restrained, falsely imprisoned, stalked, harassed, and/or otherwise attacked by Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attacks on Plaintiff caused Plaintiff to suffer physical and or psychological harm from which they may never fully recover.

164. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

## FOURTEENTH CAUSE OF ACTION
## STRICT PRODUCT LIABILITY: FAILURE TO WARN

165. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

166. Uber manufactured and distributed the Uber App.

167. The Uber App presented potential risks of introducing Uber driver to a passenger who, because of the nature of the ridesharing arrangement created and facilitated by the Uber App, could neither escape from the Uber drivers' vehicle nor control the place where the driver would take the passenger, which could result in the sexual assault of that passenger; these are risks that were known or knowable at the time of manufacture and distribution of the Uber App.

168. The potential risks presented a substantial danger when the Uber App was used or misused in an intended or reasonably foreseeable way.

169. Ordinary consumers such as Plaintiff would not have recognized the potential risks. Defendant Uber failed to adequately warn consumers, including Plaintiff, of these potential risks.

170. Uber's failure to provide passengers, including Plaintiff, with sufficient warnings regarding the risk of harm to which they were being exposed with each Uber ride was a substantial factor in causing the harm suffered by Plaintiff, including being kidnapped, sexually assaulted, sexually battered, restrained, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal

safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and or psychological harm from which some may never fully recover.

171. As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof. Plaintiff seeks actual damages, punitive damages as allowed by law, attorney's fees, costs, and/or in the alternative to actual damages and statutory damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims and issues as permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants, jointly and severally, as to all Causes of Action, awarding Plaintiff in amounts likely to exceed $150,000:

i. Compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages, past and future;

ii. Treble damages, penalties, costs and attorney's fees;

iii. Punitive damages;

iv. Interest, costs and disbursements;

v. Entering Judgment in favor of the Plaintiff in a final order against each of the Defendants;

vi. For such other and further relief as this court may deem just and proper.

WHEREFORE, Plaintiff prays that the Court them judgment in their favor against Defendants and award them compensatory damages, attorney's fees and costs, and any other relief deemed just and proper.

Dated: September 17, 2025

/s/ Joseph Ciaccio
Joseph L. Ciaccio

Napoli Shkolnik, PLLC
400 Broadhollow Road – Suite 305
Melville, New York 11747
(212) 397-1000
jciaccio@napolilaw.com